Kimberly Channick (#325089)
  kchannick@alexwalshlaw.com
WALSH LAW PLLC
13428 Marcella Avenue, #203
Marina del Rey, CA 90292
Telephone: (310) 596-4545

Alex Walsh (*pro hac vice forthcoming*)
  awalsh@alexwalshlaw.com
WALSH LAW PLLC
1050 Connecticut Ave, NW, Suite 500
Washington D.C. 20036
Telephone: (213) 863-4276
Fax: (202) 780-3678

David B. Byrne III (*pro hac vice forthcoming*)
  david.byrne@beasleyallen.com
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MIKES, P.C.
218 Commerce Street
Montgomery, Alabama 36104
Telephone: (334) 269-2343

Seth Meyer (*pro hac vice forthcoming*)
  sam@kellerlenkner.com
Alex Dravillas (*pro hac vice forthcoming*)
  ajd@kellerlenkner.com
KELLER LENKNER LLC
150 N. Riverside Plaza
Suite 4270
Chicago, Illinois 60606
Telephone: (312) 741-5220
Fax: (312) 971-3502

Warren Postman (#330869)
  wdp@kellerlenkner.com
KELLER LENKNER LLC
1300 I Street, N.W., Suite 400E
Washington, D.C. 20005
Telephone: (202) 918-1123
Fax: (312) 971-3502

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

JOHANNA DOMINGUEZ and
SHARRON MEIJER, individually and
on behalf of all others similarly situated,

)
)
)
)
)
)

Plaintiffs,

)
)
)

vs.

)
)
)

JOHNSON & JOHNSON CONSUMER,
INC.,

)
)
)

Defendant.

)
)
)
)
)
)
)

Case Number: _____

**CLASS ACTION COMPLAINT**

**(Jury Trial Demanded)**

CLASS ACTION COMPLAINT

Plaintiffs, Johanna Dominguez and Sharron Meijer ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Defendant Johnson & Johnson Consumer Inc. ("JJCI"), and in support thereof state as follows:

**<u>NATURE OF THE CASE</u>**

1.      This is a class action lawsuit brought by Plaintiffs and other similarly situated purchasers of certain sunscreen products manufactured, marketed, distributed, and sold by JJCI under the brand names "Aveeno" and "Neutrogena."[1]  Recent independent scientific testing, confirmed by JJCI through a massive nationwide recall, has revealed that several of JJCI's Neutrogena and Aveeno sunscreen products contain dangerous and unacceptable levels of benzene, a known human carcinogen (hereinafter the "Products").

2.      Each and every one of the Products has been marketed and sold as "sunscreen" by JJCI through packaging and other advertising materials, as required by 21 C.F.R. § 201.327(b).

3.      Each and every one of the Products fails to include labeling indicating that the Product may contain benzene as an active or inactive ingredient.

4.      The presence of benzene rendered the Products adulterated, misbranded, and unlawful for sale.  JJCI's conduct with respect to the Products caused economic damages to Plaintiffs and the putative Class.  This suit is brought for injunctive relief and restitution of the full purchase price of the Products.

5.      Benzene is a simple hydrocarbon, $C_6H_6$, often found in crude oil and most easily identified by the smell associated with gasoline.  It is used in industrial settings to make plastics, resins, synthetic fibers, and rubber lubricants, as well as dyes, detergents, drugs, and pesticides.

6.      Benzene is classified as a human carcinogen by the United States Department of Health and Health Services ("DHHS").  The World Health Organization ("WHO") and the International Agency for Research on Cancer ("IARC") have concluded that benzene is a Group 1

_____

[1] JJCI is the manufacturer and/or distributor of the Products, and as of 2015, has succeeded to all the debts and liabilities of the Neutrogena brand and the Products.  On information and belief, JJCI has, and continues to, operate the Neutrogena brand from its offices in Los Angeles, California.  Likewise, on information and belief, JJCI is liable for all claims related to Aveeno products.

1
CLASS ACTION COMPLAINT

compound, *i.e.* it is "carcinogenic to humans."[2]

7.      Scientific studies have established that exposure to benzene can cause leukemia, other blood and bone marrow disorders (including anemia), and a weakened immune system.  In addition, benzene has been linked to multiple myeloma and non-Hodgkin's lymphoma.

8.      The Food and Drug Administration ("FDA") classifies benzene as a Class 1 solvent, a group that encompasses materials that "should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity or . . . deleterious environmental effect."[3]  In those limited cases where use of benzene is "unavoidable in order to produce a drug product with a significant therapeutic advance," the FDA has restricted levels to 2 parts per million ("ppm").  In all other cases, no level of benzene is acceptable.

9.      The FDA regulates sunscreens to ensure they meet safety and effectiveness standards.  All products that claim to provide Broad Spectrum Sun Protection Factor ("SPF") protection, including the Products, are regulated as over-the-counter drugs, rather than as cosmetics.  21 C.F.R. § 352, et seq.  The FDA requires sunscreen manufacturers to subject their products to certain testing before they are made available to any consumer.  The FDA has also identified those materials that qualify as acceptable active ingredients for products labeled as sunscreen.  Benzene is not one of those acceptable ingredients.

10.      The FDA's regulations provide that an "over-the-counter sunscreen drug product in a form suitable for topical administration is generally recognized as safe and effective and is not misbranded if it meets" certain conditions.  21 C.F.R. § 352.1(a).  Among other things, the product must contain "only suitable inactive ingredients which are safe in the amounts administered" and contains only listed active ingredients at levels "that do[] not exceed the amount reasonably required to achieve [their] intended effect."  21 C.F.R. § 330.1(h).

---

[2] International Agency for Research on Cancer and World Health Organization, *IARC Monographs on the Identification of Carcinogenic Hazards to Humans* (https://monographs.iarc.who.int/list-of-classifications)

[3] Food and Drug Administration, *Q3C – Tables and List Guidance for Industry* (2017) (https://www.fda.gov/media/71737/download)

11.     Valisure is an independent pharmacy, registered with the FDA, whose scientists analyze the safety of various consumer products. Recently, Valisure conducted a study on the potential carcinogenicity of active ingredients in a variety of sunscreens and after sun products, including numerous products manufactured, marketed, and sold by JJCI. These included:

- Ultra Sheer Weightless Sunscreen Spray, SPF 100+
- Ultra Sheer Weightless Sunscreen Spray, SPF 70
- Ultra Sheer Dry-Touch Water Resistant Sunscreen, SPF 70
- Ultra Sheer Body Mist Sunscreen Broad Spectrum, SPF 45
- Ultra Sheer Body Mist Sunscreen Broad Spectrum, SPF 30
- Invisible Daily Defense Body Sunscreen Broad Spectrum, SPF 60+
- CoolDry Sport Water-Resistant Sunscreen Spray, SPF 70
- CoolDry Sport Water-Resistant Sunscreen Spray, SPF 50
- Beach Defense Oil-Free Body Sunscreen Spray, SPF 100
- Beach Defense Spray Body Sunscreen, SPF 50

12.     During its study, Valisure detected high levels of benzene in several JJCI product batches. In particular, Valisure identified benzene levels over 2 ppm in ten Neutrogena sunscreen batches from five separate products lines. (See table below.) It identified benzene levels of up to 2 ppm in thirteen Neutrogena sunscreen batches from ten different product lines.[4]

13.     By way of reference, the National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by any worker expecting to be exposed to benzene at concentrations of 0.1 ppm for over 10 hours or 1 ppm for 15 minutes.[5] NIOSH lists

---

[4] Should discovery reveal additional sunscreen products that are affected by this action and Plaintiff reserve their right to include additional sunscreen products manufactured, sold, and distributed by JJCI should discovery identify additional such products relevant to this action.

[5] Centers for Disease Control and Prevention. The National Institute for Occupational Safety and Health, BENZENE: Systemic Agent (2011) (https://www.cdc.gov/niosh/ershdb/emergencyresponsecard_29750032.html)

"skin absorption" as one way a person could be exposed to dangerous levels of benzene.[6]

| Brand Name | Type | Description | SPF | UPC | Lot | Exp. | Active Pharmaceutical Ingredient(s) | Benzene Avg ppm | % St Dev |
|---|---|---|---|---|---|---|---|---|---|
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 100+ | 100+ | 086800100416 | 04820E04 | 2022-01 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 6.26 6.77* | 7% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 07020E01 | 2023-02 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.96 | 7% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 06920E01 | 2023-02 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.76 | 5% |
| Sun Bum | Gel | Cool Down Gel | N/A | 871760002005 | S0082C | – | N/A (Cosmetic Product) | 5.33 5.49* | 3% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 02320E01 | 2022-12 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.30 | 2% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 04721E02 | 2023-01 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 5.20 5.59* | 5% |
| CVS Health | Spray | After-sun Aloe Vera Soothing Spray | N/A | 050428390832 | 8140449A | – | N/A (Cosmetic Product) | 4.71 4.55* | 1% |
| Neutrogena | Spray | Invisible Daily Defense Body Sunscreen Broad Spectrum SPF 60+ | 60+ | 086800111542 | 04921E01 | 2024-01 | Avobenzone 3%, Homosalate 10%, Octisalate 5%, Octocrylene 10% | 4.65 5.27* | 4% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 100+ | 100+ | 086800100416 | 03120E02 | 2021-12 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 4.11 6.00** | 15% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 28020E01 | 2022-09 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 4.01 4.00* | 4% |
| CVS Health | Spray | After-sun Aloe Vera Soothing Spray | N/A | 050428390832 | 4111849A | – | N/A (Cosmetic Product) | 3.58 3.93* | 4% |
| Neutrogena | Spray | Beach Defense Spray Body Sunscreen SPF 50 | 50 | 086800112549 | 25520E01 | 2023-08 | Avobenzone 3%, Homosalate 10%, Octisalate 5%, Octocrylene 10% | 3.52 3.71* | 3% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 31420E04 | 2022-10 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 3.08 2.64* | 2% |
| Fruit of the Earth | Gel | Aloe Vera Gel | N/A | 071661001200 | 6612940A | – | N/A (Cosmetic Product) | 2.78 2.94* | 6% |

14.     Valisure determined that benzene is not unavoidably present in the sunscreen products.  Indeed, many of the sunscreens that Valisure tested contained no benzene.  Nor is benzene's presence in the products related to any known, let alone significant, therapeutic advance.  Benzene is not a listed active or inactive ingredient on the label of any of the Products, and JJCI has never otherwise warned consumers that the Products may contain benzene.

15.     Products with avoidable levels of benzene do not "contain[] only suitable inactive ingredients which are safe in the amounts administered" or contain only listed active ingredients at levels "that do[] not exceed the amount reasonably required to achieve [their] intended effect." 21 C.F.R. § 352.1(a); 21 C.F.R. § 330.1(e)(h).

16.     Accordingly, per FDA guidelines, any significant detection of benzene in the Products should be deemed unacceptable.

17.     Valisure states that the presence of benzene in the Products may be the result of

---

[6] Centers for Disease Control and Prevention. The National Institute for Occupational Safety and Health (NIOSH), Benzene (October 30, 2019) (https://www.cdc.gov/niosh/npg/npgd0049.html)

contamination.  Valisure does not identify how this contamination could have occurred, but its testing showed how readily detectable this dangerous contaminant is in the Products.

18.     As Valisure concluded, the presence of a known human carcinogen in the Products is especially troubling as the Products are "widely recommended for the prevention of skin cancer and regularly used by adults and children in large volumes."[7]  Because "[s]unscreen products are typically used in many times higher volume than standard drug products like tablets or capsules," "even a relatively low concentration limit can result in very high total exposure."[8]  As one researcher and clinician from Yale University has explained, "Considering that human skin has a large total surface area ($\sim$1.85 m$^2$), and that $\sim$28.5 g of sunscreen is needed per application to properly cover that skin surface, it follows then that there is not a safe level of benzene that can exist in sunscreen products."[9]

19.     To put this figure in context, at the FDA conditional restriction limit of 2 ppm for benzene, 28.5 g of sunscreen would contain 57,000 ng of benzene in a single application which may reasonably be used 4 times per day, therefore amounting to 228,000 ng of benzene exposure per day.  Other comparable carcinogens, such as N-Nitrosodimethylamine ("NDMA"), have permissible daily intakes of around 96 ng.  This means a sunscreen with a benzene detection of 6.26 ppm, such as JJCI's Ultra Sheer Weightless Sunscreen Spray, SPF 100+, equates to approximately 695,800 ng of benzene in one day or *7,248 times the limit for comparable carcinogens*.

20.     On May 25, 2021, Valisure filed a citizen petition with the FDA, detailing its findings and asking the FDA to recall all batches of sunscreen products in which benzene was detected, including all batches of Neutrogena products containing the carcinogen.

21.     As Valisure explained in its petition, the presence of benzene in the Products

---

[7] Light, Kucera, and Wu, *Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care Products*, p. 2 (May 24, 2021).

[8] *Id*. at 16.

[9] Email from Dr. Christopher Bunick, MD, PhD, Associate Professor of Dermatology at Yale University, New Haven, CT to Valisure.

renders them adulterated under Section 501[10] of the Federal Drug and Cosmetics Act ("FDCA") and misbranded under Section 502[11] of the FDCA, in violation of 21 U.S.C. § 351 and 21 U.S.C. § 352, respectively.  The Products are also misbranded under Cal. Health & Safety Code § 111330 and N.Y. Educ. Law § 6802(13).

22.     Federal and analogous state law prohibits the manufacture, distribution, and receipt of any misbranded or adulterated drug.  *See* 21 U.S.C. § 331(a); Cal. Health & Safety Code § 111440; N.Y. Educ. Law § 6811.  Nonetheless, JJCI waited nearly two months before removing the *some* of the Products from the market.  Despite announcing a nationwide recall of many aerosol Products on July 14, 2021,[12] as of the date of this filing, JJCI continues to market, sell, and profit from the Products using false and misleading statements regarding their safety.[13]

23.     Despite the Valisure petition's extensive reporting on the presence of benzene in its products, JJCI waited nearly two months to recall *any* of the Products or warn members of the public of the risks to their health or safety.

24.     When JJCI finally did announce the presence of benzene in the Products, it also revealed that not only had Neutrogena products been adulterated and mislabeled, but that benzene was also present in at least the Aveeno brand Protect + Refresh aerosol sunscreen product line.

25.     Despite the Valisure petition's extensive reporting on the presence of benzene in its products, JJCI waited nearly two months before taking any action to remedy the mislabeling of

---

[10] Section 501(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act provides that a drug (including a drug contained in a medicated feed) shall be deemed to be adulterated if the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirement of the act as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess.

[11] Section 502(a) declares that a drug or device is misbranded if its labeling proves false or misleading in any particular.

[12] https://www.neutrogena.com/sunscreen-recall.html

[13] To date, JJCI has made no recall of Ultra Sheer Dry-Touch Water Resistant Sunscreen SPF 70.

1    the Products.

2         26.     To date, JJCI has not explained why or how benzene is present in the Products, or

3    whether JJCI conducted testing that could and should have detected benzene.

4         27.     The revelation that the Products contain unacceptable levels of benzene, and are

5    therefore adulterated and misbranded, stands in stark contrast to JJCI's long-standing branding,

6    marketing, and advertising strategy for Neutrogena and Aveeno products, including its sunscreen.

7    That strategy revolves around convincing consumers that the Products are safe and healthy.

8         28.     The packaging for the Products, as well Neutrogena's website, have long

9    represented to consumers that the Products are "#1 Dermatologist Recommended."[14]  The basis

10   for this representation, which clearly aims to portray the product as safe and healthy, is nowhere

11   specified on either the Products packaging or website.  And the representation remains unchanged

12   even in the wake of Valisure's discovery and citizen's petition.  Nowhere do Defendants explain

13   if or how dermatologists recommended the Products with knowledge that they contain benzene.

14   However, the Neutrogena website acknowledges that "[t]he strong relationship between

15   Neutrogena® Corporation and dermatologists gave the company an exceptional competitive

16   advantage."[15]

17

18

19

20

21

22

23

24

25

26

---

27   [14] https://www.neutrogena.com/the-bar/why
     neutrogena.html?q=dermatologist%20recommended (last visited July 9, 2021)

28       [15] *Id.* (last visited July 9, 2021).

7







1
2
3
4
5
6
7
8
9
10
11
12
13



14
15
16
17
18
19
20
21
22
23
24
25



26          29.     Neutrogena also makes a point of associating the word "clean" with its Ultra Sheer

27  product line, repeatedly noting in both its packaging and advertising that the product is "clean."

28  Ironically, in Valisure's testing, Neutrogena's Ultra Sheer products held four of the top five spots

in benzene ppm.



30.    The packaging for the Aveeno Products, meanwhile, represents to consumers that the Aveeno Products have been "Dermatologist recommended for over 65 years."  The representation remains unchanged even in the wake of Aveeno's recall.  Nowhere does JJCI explain if or how dermatologists recommend the Products with knowledge that they contain benzene.



31.     JJCI's efforts to portray its sunscreens as clean and doctor approved extends to its commercials as well.  For example, commercials for Neutrogena Ultra Sheer, starring actress Jennifer Garner, prominently display the representation, "#1 Dermatologist Recommended Suncare."[16]  In these commercials, Ms. Garner emphasizes the "clean" feel of the product and deems it "the best for your skin."[17]

---

[16] *Neutrogena Ultra Sheer Dry Touch TV Commercial Featuring Jennifer Garner* https://www.ispot.tv/ad/7ZH8/neutrogena-ultra-sheer-dry-touch-featuring-jennifer-garner    (last visited July 13, 2021).

[17] GRANDLARGETV, *Neutrogena w/Jennifer Garner*, YOUTUBE (Feb. 23, 2017) https://www.youtube.com/watch?v=K55T4vbJa6Y

32.     Another commercial, advertising the Neutrogena Beach Defense line, features children playing on a beach and happily being sprayed with Neutrogena sunscreen.  The commercial emphasizes that the product is the "sun care brand used most by dermatologists and their families."  Smiling children appear as the word "families" is heard.[18]

33.     Neutrogena also touts itself as a "[l]eading the way" in product testing.  The company's website has an entire page dedicated to its supposedly high product-testing standards; among other claims, Neutrogena purports to "not only follow individual country regulations, but also look to incorporate the best thinking and practices from top authorities for skincare products around the world."  The webpage goes on to explain that the company "set[s] a high bar for using ingredients.  Our ingredients are screened for quality, manufacturing process, government regulations, published research, and our own ingredient safety databases."  The company also makes specific claims about it manufacturing process, emphasizing that "[s]afety goes beyond the ingredients list," with attention also paid to "how our ingredients are used, our manufacturing safeguards, how the products are used, and testing requirements for our products."[19]

34.     Neutrogena's product testing webpage links to another JJCI webpage regarding the company's safety and care commitment.  This webpage notes that, "Your safety is our priority. That's why our safety assessment process meets or exceeds industry and regulatory standards for baby and beauty personal care products.  It's a process that never ends–we continually review our product ingredients against the latest research and consumer feedback.  We believe our process is among the most rigorous in the world and is at the core of our Safety & Care Commitment."[20] The webpage goes on to state that "Our Safety & Care Commitment means that every product is carefully reviewed and evaluated against internationally recognized standards."  The webpage

---

[18] *Neutrogena Beach Defense TV Commercial, 'More Protection. More Sun.'*, https://www.ispot.tv/ad/OBGJ/neutrogena-beach-defense-more-protection-more-sun  (last  visited July 13, 2021).

[19] *Neutrogena Product Testing*, https://www.neutrogena.com/producttesting.html (last visited July 13, 2021).

[20] *Commitment*, https://safetyandcarecommitment.com/commitment (last visited July 13, 2021).

then reiterates the tenants of product testing that appear on the Neutrogena website.[21]

35.     Aveeno's website likewise aggressively markets its products as contributing to consumers' health and emphasizes that its products are comprised of ingredients from nature. Aveeno's "About Aveeno" webpage is replete with claims about the safety and supposedly "natural" origins of its ingredients.  For example, the webpage states "Healthy Skin, Naturally: Nature fuels our healthy spirit, just like healthy skin fuels yours.  We research and work with scientists and dermatologists around the world to unlock the therapeutic power of nature's most restorative ingredients, giving you clinically-proven products that nurture and care for your skin, so you can care for what's most important in life."  The webpage goes on to explain that the company was started based on two brothers' belief that "nature holds the secret to human health" and notes that since the creation of the brand, it has "published 70 years of clinical evidence supporting the benefits of not just oat, but other natural ingredients."  Under the section about Aveeno's supposed "Commitment to Wellness," the company notes when it comes to its ingredients "'Good enough' is never good enough for Aveeno®.  Our internal standards for safety testing and ingredient quality far exceed those set by regulators around the world. . . . We think about every element we use in every one of our products—where it came from, what it does and how it impacts you and your skin.  Only ingredients that pass our strict 5-step safety assurance process are used."[22]

36.     On Aveeno's webpage dedicated to sun products, the company goes even further to advertise its products as safe and healthy.  The webpage notes "Soak Up The Sun Worry Free: The best sun care leaves you feeling carefree.  Aveeno's powerful and hydrating sun protection with broad spectrum SPF keeps your skin safe and healthy so you can enjoy sunny moments without a single worry."[23]

37.     Representations made on JJCI's Neutrogena and Aveeno websites remain today,

---

[21] *Id.*

[22] About Aveeno, https://www.aveeno.com/about (last visited July 14, 2021).

[23] https://www.aveeno.com/sun

despite the recall of their products, making no mention of Valisure's findings. These representations do not, and upon information and belief have never, explained whether or not JJCI itself bothered to test its products for benzene and, if such testing did actually occur, what the results were.

38. In addition, the website for JJCI's corporate parent, Johnson & Johnson, continues to promote a wide variety of articles claiming that chemical sunscreens, like the Products, are safe. For example, one webpage titled "The Science of Sunscreen: 3 Experts Tackle Common Myths About Its Safety" notes that both mineral and chemical sunscreens "are considered safe and effective, and have been used by consumers for decades." The article quotes a Dr. Joshua Zeichner as stating "[d]espite anecdotal reports questioning the safety of the ingredients in sunscreen, there is no data that shows there is any harm to your health by using it." The article also notes a 2011 review of sunscreen ingredients, which "found that none were shown to have toxicity in humans."[24] The referenced article, "Current Sunscreen Controversies: A Critical Review" by Mark Burnett and Steven Wang, unsurprisingly did not examine the toxicity of benzene.

39. Other articles on the Johnson & Johnson website tout Neutrogena's products as essential to health, including, ironically, cancer prevention. For example, one article titled "8 Things We Learned From the New Neutrogena Documentary In the Sun," notes that "[p]revention [of melanoma] starts with sunscreen."[25] Another article titled "The ABCs and 123s of Smart Summer Skin Care," encourages readers to share the provided sunscreen facts and "have

---

[24] Sunny Sea Gold, *The Science of Sunscreen: 3 Experts Tackle Common Myths About Its Safety*, (May 20, 2019), https://www.jnj.com/health-and-wellness/sunscreen-safety-myths-experts-tackle-the-science-of-sun-protection; *see also* Krista Bennett DeMaio, *5 Things We Now Know About the Safety and Effectiveness of Sunscreen*, (May 23, 2017), https://www.jnj.com/health-and-wellness/5-things-we-now-know-about-safety-and-effectiveness-of-sunscreen (noting that "[s]unscreen is . . . safe to use" and that "[w]e've been using some of the[] ingredients [in sunscreen] for 30 years with a proven safety record—and there's much more evidence of benefit than harm")

[25] Krista Bennett DeMaio, *8 Things We Learned From the New Neutrogena Documentary In the Sun,* (May 18, 2021), https://www.jnj.com/health-and-wellness/sun-safety-facts-from-neutrogena-documentary-in-the-sun

a safe, healthy summer!"[26]

40.     Neutrogena even created the "Choose Skin Health Movement," which was purportedly designed to "change the future of skin health and reduce the risk of skin cancer through education, empowerment, and early detection."[27]  Several celebrities filmed spots for the campaign, including Jennifer Garner, Kristen Bell, and Kerry Washington.  In the kick-off video for the campaign, Ms. Garner emphasized the statistics on skin cancer and ended by stating that she chooses "Neutrogena suncare because "[she] choose[s] skin health."[28]  In another such video, Garner states that she "wears Neutrogena Ultra Sheer 45 every day because" she chooses "skin health."[29]  This sunscreen is from the same product line as many of the products Valisure revealed to be contaminated.  In yet another video, Ms. Washington advises viewers to "[p]rotect yourself and those you love.  Choose skin health for a lifetime of healthy skin."[30]

41.     JJCI's failure to prevent the presence of benzene in the Products, and its continued sale of these dangerous and illegal products, constitutes actionable fraud.  As of the date of this filing, JJCI continues to mislead and defraud consumers by making affirmative

---

[26] *The ABCs and 123s of Smart Summer Skin Care*, (June 15, 2016), https://www.jnj.com/health-and-wellness/the-abcs-and-123s-of-smart-summer-skin-care.  And the sunscreen-safety related articles do not stop there.  *See, e.g.,* Elizabeth Marglin, *6 Summer Sun Safety Tips From Seasoned Moms,* (June 7. 2017), https://www.jnj.com/health-and-wellness/6-summer-sun-safety-tips-from-seasoned-moms; Gigi Ross, *Being Sun Smart for UV Safety Month*, (July 19, 2013), https://www.jnj.com/our-company/being-sun-smart-for-uv-safety-month.

[27] Neutrogena is kicking off its 2016 Choose Skin Health Campaign, HAPPI (July 1, 2016), https://www.happi.com/issues/2016-07-01/view_breaking-news/neutrogena-is-kicking-off-its-2016-choose-skin-health-campaign/

[28] Neutrogena, Jennifer Garner Shares Why You Should Join the #ChooseSkinHealth Movement, YOUTUBE (May 21, 2014), https://www.youtube.com/watch?v=l1ep2dy4tS4&list=PLPA6DFZGPXhk7_EodvLLFRZRJK-mTwojI&index=14

[29] Neutrogena, Jennifer Garner Shares Her Daily Sunscreen, YOUTUBE (May 22, 2014), https://www.youtube.com/watch?v=38AIdCY1evQ

[30] Neutrogena, Kerry Washington Gets Personal About Her Skin Health, YOUTUBE (July 22, 2015), https://www.youtube.com/watch?v=HokEk_1hwKI&list=PLPA6DFZGPXhk7_EodvLLFRZRJK-mTwojI

misrepresentations that portray the product as safe, and omitting from the Products' packaging and marketing materials information about the actual danger of the Products, including any warning to consumers that the Products may contain unacceptable levels of benzene rendering them adulterated, misbranded and illegal.

42.     Because benzene is not a necessary ingredient in the Products—and if it were, concentrations above 2 ppm are entirely prohibited by federal law—the Products are illegal and unfit for sale in trade or commerce.  This prohibition on any sale of the Products whatsoever renders the adulterated, misbranded, and unlawfully sold Products legally worthless.  If the Products had been truthfully and accurately labeled, no consumer would have purchased the Products.  Accordingly, Plaintiffs and the Classes were injured by the full purchase price of the Products.

43.     Plaintiffs and the Classes paid for suncare products free of carcinogens.  Because JJCI sold them products that may contain dangerous levels of benzene, Plaintiffs and the Classes were deprived of the benefit of their bargain.

44.     Plaintiffs are further entitled to damages for the injury sustained in being exposed to high levels of acutely toxic benzene, damages related to JJCI's conduct, and injunctive relief.

**PARTIES**

45.     Plaintiff Johanna Dominguez is a resident of Riverside, California.

46.     Plaintiff Dominguez has purchased Neutrogena Beach Defense Spray Body Sunscreen, SPF 50 and Ultra Sheer Body Mist Sunscreen Broad Spectrum, SPF 70 during the relevant class period.  When purchasing the Products, Plaintiff Dominguez reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer, distributor, and pharmacy that the Product was properly manufactured, free from defects, and safe for its intended use.  Plaintiff Dominguez relied on these representations and warranties in deciding to purchase the Products manufactured by JJCI, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Products from JJCI if she had known that it was not, in fact, properly manufactured free from defects, unadulterated, and properly labeled.

47.     Plaintiff Sharron Meijer is a resident of Brooklyn, New York.

48.     Plaintiff Meijer has purchased Neutrogena Ultra Sheer Dry Touch Water Resistant Sunscreen Lotion SPF 70 and Neutrogena Ultra Sheer Dry Touch Water Resistant Sunscreen Lotion SPF 55.  When purchasing the Products, Plaintiff Dominguez reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer, distributor, and pharmacy that the Product was properly manufactured, free from defects, and safe for its intended use.  Plaintiff Meijer relied on these representations and warranties in deciding to purchase the Products manufactured by JJCI, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Products from JJCI if she had known that it was not, in fact, properly manufactured free from defects, unadulterated, and properly labeled.

49.     Plaintiffs have standing to represent members of the Classes because there is sufficient similarity between the specific Products purchased by the Plaintiffs and the other Products purchased by the Classes.  Specifically, each and every one of the Products are marketed and labeled in the same way—as "sunscreen"—and fail to indicate to consumers that the Products may contain benzene as an active or inactive ingredient; accordingly, all members of the Classes were injured in substantially the same manner.

50.     Defendant Johnson & Johnson Consumer Inc. is a New Jersey corporation with its headquarters at 199 Grandview Road, Skillman, New Jersey, 08558.  JJCI is a subsidiary of the Johnson & Johnson conglomerate.  JJCI is the manufacturer and/or distributor of the Products, and as of 2015, has succeeded to all the debts and liabilities of the Neutrogena brand and the Products.  On information and belief, JJCI has, and continues to, operate the Neutrogena brand from its offices in Los Angeles, California.  Likewise, on information and belief, JJCI is liable for all claims related to Aveeno products.

## JURISDICTION AND VENUE

51.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than JJCI, there are more

1    than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000

2    exclusive of interest and costs.

3         52.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2) because

4    substantial acts in furtherance of the alleged improper conduct, including the dissemination of

5    deceptive information regarding the benefits of the Products occurred within this District.  Venue

6    is also proper under 18 U.S.C. § 1965(a) because JJCI transacts substantial business in this

7    District.

8         53.    This Court has jurisdiction over JJCI because JJCI is authorized to conduct and do

9    business in California.  JJCI has marketed, manufactured, promoted, distributed, and sold

10   sunscreen protection products, including the Products, from California.  JJCI has established

11   sufficient minimum contacts with this State by having availed itself of the markets in this State

12   through its promotion, manufacture, sale, distribution and marketing of its sunscreen protection

13   products, such that exercise of jurisdiction by this Court permissible.  A substantial portion of all

14   claims alleged on behalf of Plaintiffs and the Classes arise out of conduct occurring in the State of

15   California.

16                          **CLASS ACTION ALLEGATIONS**

17        54.    Plaintiffs bring this action on behalf of themselves and all other similarly situated

18   consumers pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and

19   seeks certification on behalf of all members of the following class(es):

20        The Nationwide Subclass
21        All consumers who purchased any lotion or spray Product in the in the United States for
          personal use or consumption.

22        The New York Subclass
23        All consumers who purchased any lotion or spray Product in the in the State of New York
          for personal use or consumption.

24        55.    Excluded from each Class are individuals who allege personal bodily injury

25   resulting from the use of Products.  Also excluded from each Class are JJCI, any parent

26   companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-

27   conspirators, all governmental entities, and any judge, justice or judicial officer presiding over

28

1  this matter.

2       56.    **Numerosity**: Plaintiffs do not know the exact size of each Class, but given the

3  nature of the claims and JJCI's sales of the Products across California, New York, and the United

4  States, Plaintiffs believe that each of the Subclasses is so numerous that joinder of all members is

5  impracticable.  Plaintiffs are informed and believe that the proposed Subclasses each contain tens

6  of thousands of purchasers of JJCI's Products who have been damaged by JJCI's conduct as

7  alleged herein.

8       57.    **Typicality**.  Plaintiffs' claims are typical to those of all Class members because

9  members of each Class have been similarly injured through JJCI's uniform misconduct described

10  above and were subject to JJCI's deceptive sunscreen claims that accompanied each and every

11  sunscreen product in the Neutrogena and Aveeno collections.  Plaintiffs are advancing the same

12  claims and legal theories on behalf of herself and all members of each Class.  Specifically, each

13  and every one of JJCI's Products fails to include labeling indicating to consumers that the

14  Products may contain benzene as an active or inactive ingredient.  Accordingly, the misleading

15  effect of all of the Sunscreen Products are substantially the same, and Plaintiffs' claims are

16  typical for the Classes.

17       58.    **Common Questions of Law and Fact**.  Plaintiffs' claims raise questions of law

18  and fact common to all members of each Class, and they predominate over any questions

19  affecting only individual Class members.  The claims of Plaintiffs and all prospective Class

20  members involve the same alleged defect.  These common legal and factual questions include the

21  following:

22            (a) whether JJCI's Products contained benzene;

23            (b) whether JJCI's representations and omissions, seen in their marketing,

24                advertising, packaging, labeling, and other promotional materials, are true,

25                or are misleading, or objectively reasonably likely to deceive;

26            (c) whether the alleged conduct constitutes violations of the laws asserted;

27            (d) whether JJCI's alleged conduct violates public policy;

28            (e) whether JJCI engaged in false or misleading advertising;

CLASS ACTION COMPLAINT

(f) whether JJCI's manufacturing, marketing, distributing, and selling of the Products violates California's Sherman Food, Drug, and Cosmetics Law, Cal. Health & Safety Code § 111225, et seq.;

(g) whether JJCI's business practices as alleged herein are unlawful under the Consumers Legal Remedy Act, Cal. Civ. Code § 1750, et seq.;

(h) whether JJCI's business practices as alleged herein were and are likely to deceive reasonable consumers in the United States by obfuscating the true nature of the Products, all in violation of California Business and Professions Code § 17500;

(i) whether JJCI is liable to Plaintiffs and the Classes for unjust enrichment;

(j) whether JJCI's marketing and sale of the Products in New York constitutes a deceptive act or practice in the conduct of trade or commerce, as prohibited by New York's Consumer Protection from Deceptive Acts and Practices Law, N.Y. Gen. Bus. Law § 349, et seq.;

(k) whether JJCI's marketing of the Products in New York constitutes false advertising in the conduct of any business, trade or commerce, as prohibited by New York's Consumer Protection from Deceptive Acts and Practices Law, N.Y. Gen. Bus. Law § 350, et seq.;

(l) whether Plaintiffs and members of the Classes are entitled to damages and/or restitution and the proper measure of that loss; and

(m) whether Plaintiffs and the members of the Classes are entitled to declaratory and injunctive relief.

59.     **Adequacy of Representation**.  Plaintiffs will fairly and adequately protect and represent the interests of each Class.  Plaintiffs have retained counsel who are highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Classes.  Plaintiffs have no interests that are adverse or antagonistic to those of the Classes.

60.     **Superiority**.  A class action is superior to the other available methods for a fair

and efficient adjudication of this controversy.  The damages or other financial detriment suffered by the Plaintiffs and individual Class members is relatively small compared to the burden and expense of individual litigation of their claims against JJCI.  It would thus be virtually impossible for Plaintiffs and Class members, on an individual basis, to obtain effective redress for the wrongs done to them.  Further, it is desirable to concentrate the litigation of the members' claims for each Class in one forum, as it will conserve party and judicial resources and facilitate the consistency of adjudications.  Plaintiffs know of no difficulty that would be encountered in the management of this case that would preclude its maintenance as a class action.

61.    Plaintiffs seek preliminary and permanent injunctive and equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to enjoin and prevent JJCI from engaging in the acts described above, such as continuing to market and sell the Products that may be adulterated with benzene, and requiring JJCI to provide a full refund of the purchase price of the Products to Plaintiffs and Class members.

62.    Unless the Classes are certified, JJCI will retain monies received as a result of its conduct that were taken from Plaintiffs and the members of each Class.  Unless a class-wide injunction is issued, JJCI will continue to commit the violations alleged and both the Classes and general public will continue to be misled.

**FIRST CAUSE OF ACTION**
Violation of Cal. Bus. & Prof. Code § 17200, et seq.
(On Behalf of the Nationwide Subclass)

63.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

64.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Nationwide Subclass against JJCI.

65.    JJCI's manufacturing, marketing, distributing, and selling of the Products violates California's Sherman Food, Drug, and Cosmetics Law, Cal. Health & Safety Code § 111225, et seq. ("Sherman Law").

66.    The relevant part of the Sherman Law declares that a drug is misbranded if its labeling is false or misleading in any particular way and further provides that it is unlawful for

any person to misbrand any drug.  Cal. Health & Safety Code §§ 111330, 111440, 111445.  The Sherman Law defines a "person" as "any individual, firm, partnership, trust, corporation, limited liability company, company, estate, public or private institution, association, organization, group, city, county, city and county, political subdivision of this state, other governmental agency within the state and any representative, agent, or agency of any of the foregoing."  Cal. Health & Safety Code § 109995.  JJCI is a corporation and, therefore, a "person" within the meaning of the Sherman Act.

67.     The business practices alleged above are unlawful under the Consumers Legal Remedy Act, Cal. Civ. Code § 1750, et seq. ("CLRA"), which forbids deceptive advertising.

68.     The business practices alleged above are unlawful under Cal. Bus. & Prof. Code. § 17200, et seq. by virtue of violating Cal. Bus. & Prof. Code. § 17500, et seq., which forbids untrue advertising and misleading advertising.

69.     There is no benefit to consumers or competition by deceptively marketing sunscreen products.  Indeed, the harm to consumers and competition caused by JJCI's deceptive marketing of the Products is substantial.

70.     Plaintiffs and other members of the putative class had no way of knowing that the Products they bought were not actually as marketed.  Thus, they could not have reasonably avoided the injury each of them suffered.

71.     The gravity of the consequences of JJCI's conduct as described above outweighs any justification, motive or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and it is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiffs and other members of the putative class.

72.     JJCI's deceptive marketing of the Products is likely to deceive reasonable consumers throughout the United States.  Indeed, Plaintiffs and other members of the putative class were unquestionably deceived regarding the true danger of the Products, as JJCI's marketing of the Products nowhere discloses that the Products may contain benzene, but instead portrays the Products as safe and healthy.  Said acts are deceptive business acts and practices.

73.     This deception caused Plaintiffs and other members of the putative class to purchase the Products.  Had they known and understood the true nature and quality of the Products, Plaintiffs and other members of the National Subclass would not have purchased the Products.

74.     As a result of the business practices described above, Business and Professions Code § 17203 entitles Plaintiffs and other members of the Nationwide Subclass to an order enjoining such future conduct on the part of JJCI and such other solely injunctive or declaratory relief which may be necessary as a result of JJCI's wrongful conduct.

75.     The above-described unlawful business acts and practices, and each of them, present a threat and reasonable likelihood of deception to Plaintiffs and other members of the Nationwide Subclass in that JJCI has systematically perpetrated and continues to perpetrate such acts or practices on Plaintiffs and other members of the Nationwide Subclass by means of its deceptive manufacturing, marketing, distributing, and selling of the Products.

## SECOND CAUSE OF ACTION

Violation of Cal. Civ. Code § 1750, et seq.
(On Behalf of the Nationwide Subclass)

76.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

77.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Nationwide Subclass against JJCI.

78.     This cause of action is brought pursuant to the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750, et seq. ("CLRA").

79.     JJCI's actions, representations, and conduct, as described above, and each of them, have violated and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

80.     Plaintiffs and others similarly situated will continue to suffer harm and are "consumers" as that term is defined by the CLRA in Cal. Civ. Code § 1761(d).

81.     The Products that Plaintiffs and members of the Nationwide Subclass purchased from JJCI were "goods" within the meaning of Cal. Civ. Code § 1761(a).

82.     By engaging in the actions, misrepresentations, and misconduct set forth above, JJCI have violated, and continues to violate, § 1770(a)(5) of the CLRA.

83.     Specifically, in violation of Cal. Civ. Code § 1770(a)(5), JJCI's acts and practices constitute deceptive methods of competition, in that it misrepresents the safety of the Products and omits that the Products contain a dangerous carcinogen.

84.     By engaging in the actions, misrepresentations, and misconduct set forth above, JJCI has violated, and continues to violate, § 1770(a)(7) of the CLRA.  Specifically, JJCI's acts and practices constitute deceptive methods of competition, in that JJCI misrepresents the particular standard, quality, or grade of the Products, in violation of Cal. Civ. Code § 1770(a)(7).

85.     By engaging in the actions, misrepresentations, and misconduct set forth above, JJCI has violated, and continues to violate, § 1770(a)(16) of the CLRA.  Specifically, in violation of Cal. Civ. Code § 1770(a)(16), JJCI's acts and practices constitute deceptive methods of competition, in that JJCI represents that the Products have been supplied in accordance with a previous representation when they have not.

86.     Plaintiffs request that this Court enjoin JJCI from continuing to employ the unlawful methods, acts, and practices alleged herein, and any other solely declaratory or injunctive relief the Court deems proper pursuant to Cal. Civ. Code §§ 1780 and 1781.  If JJCI is not restrained from engaging in these types of practices on the future, Plaintiffs and other members of the Nationwide Subclass will continue to suffer harm.

**THIRD CAUSE OF ACTION**

Violation of Cal. Bus. & Prof. Code § 17500, et seq.
(On Behalf of the Nationwide Subclass)

87.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

88.     At all material times, JJCI engaged in a scheme of offering the Products for sale to Plaintiffs and others similarly situated by way of, inter alia, commercial marketing.  These marketing materials misrepresented or omitted the safety of the Products and the fact that they may contain benzene, a dangerous carcinogen.  Said advertisements and inducements originated and were made from the State of California and come within the definition of advertising as

contained in Business and Professions Code § 17500, et seq. in that such marketing materials were intended as inducements to purchase the Products and are statements disseminated by JJCI to Plaintiffs and other members of the National Subclass and were intended to reach Plaintiffs and other members of the National Subclass. JJCI knew, or in the exercise of reasonable care should have known, that these statements were untrue or misleading.

89.     In furtherance of this plan and scheme, JJCI has prepared and distributed from the State of California via commercial marketing, statements that deceptively represent the safety of the Products and omitted that a dangerous carcinogen that may be present in the Products. Consumers, including Plaintiffs and other members of the Nationwide Subclass necessarily and reasonably relied on these materials concerning the Products. Consumers, including Plaintiffs and other members of the Nationwide Subclass were among the intended targets of such representations and omissions and would reasonably be deceived by such materials.

90.     JJCI's above acts, in disseminating deceptive and untrue statements from the State of California and throughout the United States to consumers, were and are likely to deceive reasonable consumers, including Plaintiffs and other members of the Nationwide Subclass, by obfuscating the true nature of the Products, all in violation of California Business and Professions Code § 17500.

91.     As a result of the above violations of California Business and Professions Code § 17500, et seq., JJCI has been unjustly enriched at the expense of Plaintiffs and the members of the Nationwide Subclass.

92.     Pursuant to Business and Professions Code § 17535, Plaintiffs and the Nationwide Subclass are entitled to an order of this Court enjoining JJCI from such future conduct, and such other orders and judgments which may be necessary to disgorge JJCI's ill-gotten gains and restore to any person in interest any money paid for the Products as a result of JJCI's wrongful conduct.

**FOURTH CAUSE OF ACTION**
Violation of N.Y. Gen. Bus. Law § 349 et seq.
(On Behalf of the New York Subclass)

93.     Plaintiffs hereby incorporate by reference the allegations contained in all

preceding paragraphs of this complaint.

94.     Plaintiff Meijer brings this claim on behalf of the New York Subclass for violation of § 349 of New York's Consumer Protection from Deceptive Acts and Practices Law, N.Y. Gen. Bus. Law § 349 et seq.

95.     Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [the State of New York]."  N.Y. Gen. Bus. Law § 349(a).

96.     JJCI's marketing and labeling of the Products, as alleged herein, constitute "deceptive" acts and practices, as such conduct misled Plaintiff Meijer and the New York Subclass as to the characteristics and value of the Products.

97.     Subsection (h) of § 349 grants private plaintiffs a right of action for violation of New York's Consumer Protection from Deceptive Acts and Practices Law, as follows:

In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions.  The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section.  The court may award reasonable attorney's fees to a prevailing plaintiff.

98.     In accordance with N.Y. Gen. Bus. Law § 349(h), Plaintiff Meijer seeks an order enjoining JJCI from continuing the unlawful deceptive acts and practices set out above.  Absent a Court order enjoining these types of practices in the future, Plaintiff Meijer and other members of the New York Subclass will continue to suffer harm.

99.     As a consequence of JJCI's deceptive acts and practices, Plaintiff Meijer and other members of the New York Subclass suffered an ascertainable loss of monies.  By reason of the foregoing, Plaintiff Meijer and other members of the New York Subclass also seek actual damages or statutory damages of $50 per violation, whichever is greater, as well as punitive damages.

## **FIFTH CAUSE OF ACTION**

Violation of N.Y. Gen. Bus. Law § 350 et seq.
(On Behalf of the New York Subclass)

100.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

101.    Plaintiff Meijer brings this claim on behalf of the New York Subclass for violation of § 350 of New York's Consumer Protection from Deceptive Acts and Practices Law, N.Y. Gen. Bus. Law § 350 et seq.

102.    Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in [the State of New York]." N.Y. Gen. Bus. Law § 350.

103.    Section 350-a defines "false advertising" as "advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect." N.Y. Gen. Bus. Law § 350-a.1. The section also provides that advertising can be false by omission, as it further defines "false advertising" to include "advertising [that] fails to reveal facts material in the light of such representations with respect to the commodity . . . to which the advertising relates." *Id*.

104.    JJCI's labeling, marketing, and advertising of the Products, as alleged herein, are "misleading in a material respect" and, thus, constitute "false advertising," as they falsely represent the Products as being safe and failing to inform consumers of the risk the Products contain benzene.

105.    Plaintiff Meijer seeks an order enjoining JJCI from continuing this false advertising. Absent enjoining this false advertising, JJCI will continue to mislead Plaintiff Meijer and the other members of the New York Subclass as to the characteristics of the Products and, in doing so, irreparably harm each of the New York Subclass members.

106.    As a direct and proximate result of JJCI's violation of New York General Business Law § 350, Plaintiff Meijer and the other members of the New York Subclass have also suffered an ascertainable loss of monies. By reason of the foregoing, Plaintiff Meijer and other members

of the New York Subclass also seek actual damages or statutory damages of $500 per violation, whichever is greater, as well as punitive damages.  N.Y. Gen. Bus. Law § 350-e.

**SIXTH CAUSE OF ACTION**

Unjust Enrichment/Quasi-Contract
(On Behalf of the Nationwide Subclass)

107.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

108.    Despite the serious risks of harm inherent in potentially exposing consumers to high levels of benzene, JJCI has not disclosed these risks, and in fact has actively obfuscated the dangers of the Products by promising consumers the Products are safe.  Plaintiffs and other members of the Nationwide Class would not have bought the Products if they had known that the promises JJCI makes regarding the Products are false.

109.    As a result of JJCI's deceptive marketing and labeling of its Products, JJCI receives a benefit at the expense of Plaintiffs and the Nationwide Subclass, and it is unjust for JJCI to retain that benefit.

110.    Under the circumstances, it is against equity and good conscience to permit JJCI to retain the ill-gotten benefits that it received from Plaintiffs and members of the Nationwide Class in light of the fact that the Products they purchased were not what JJCI represented the Products to be.  Thus, it is unjust or inequitable for JJCI to retain the benefit without restitution to Plaintiffs and other members of the Nationwide Class.

111.    As a direct and proximate result of JJCI's actions, JJCI has been unjustly enriched. Plaintiffs and other members of the Nationwide Class have a right to restitution in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request, individually and on behalf of the alleged Classes, that the Court enter judgment in their favor and against Defendants as follows:

A.   An order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as the representatives for the Classes and Plaintiffs' attorneys as Class Counsel;

B.   An order enjoining Defendants from selling the Products;

C.   An order declaring the Defendants' conduct violates the causes of action referenced herein;

D.   An order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

E.   Compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

F.   Prejudgment interest on all amounts awarded;

G.   An order of restitution and all other forms of equitable monetary relief;

H.   Injunctive relief as pleaded or as the Court may deem proper; and

I.   An order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable as of right.

Dated: July 14, 2021                          Respectfully Submitted,

/s/ *Kimberly Channick*
Kimberly Channick (#325089)
  kchannick@alexwalshlaw.com
WALSH LAW PLLC
13428 Marcella Avenue, #203
Marina del Rey, CA 90292

Alex Walsh (*pro hac vice forthcoming*)
  awalsh@alexwalshlaw.com
WALSH LAW PLLC
1050 Connecticut Ave, NW, Suite 500
Washington D.C. 20036
Telephone: (213) 863-4276
Fax: (202) 780-3678

Seth Meyer (*pro hac vice forthcoming*)

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

sam@kellerlenkner.com
Alex Dravillas (*pro hac vice forthcoming*)
  ajd@kellerlenkner.com
KELLER LENKNER LLC
150 N. Riverside Plaza, Suite 4270
Chicago, Illinois 60606
Telephone: (312) 741-5220
Fax: (312) 971-3502

Warren Postman (#330869)
  wdp@kellerlenkner.com
KELLER LENKNER LLC
1300 I Street, N.W., Suite 400E
Washington, D.C. 20005
Telephone: (202) 918-1123
Fax: (312) 971-3502

David B. Byrne III (*pro hac vice forthcoming*)
  david.byrne@beasleyallen.com
BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MIKES, P.C.
218 Commerce Street
Montgomery, Alabama 36104
Telephone: (334) 269-2343

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT